**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

TRACEY ALLEN,

                                 Plaintiff,

        v.                                         No. 3:14-CV-1368
                                               (CFH)

CAROLYN W. COLVIN, Commissioner
of Social Security Administration,

                                        Defendant.

_____

APPEARANCES:

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| LACHMAN, GORTON LAW FIRM<br>P.O. Box 89<br>1500 East Main Street<br>Endicott, New York 13761-0089 | PETER A. GORTON, ESQ. |
| Social Security Administration<br>Office of Regional General Counsel,<br>Region II<br>26 Federal Plaza - Room 3904<br>New York, New York 10278<br>Attorneys for Defendant | BENIL ABRAHAM, ESQ. |

**CHRISTIAN F. HUMMEL
U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER

Plaintiff Tracey Allen brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a decision by the Commissioner of Social Security ("Commissioner" or

"defendant") denying her applications for supplemental security income benefits ("SSI").

Plaintiff moves for a finding of disability, and the Commissioner cross moves for a

judgment on the pleadings. Dkt. Nos. 11, 16. For the following reasons, the matter

must be remanded.

## I. Background

Plaintiff, born on December 8, 1965, protectively filed for SSI benefits on January 16, 2012, alleging a disability onset date of December 6, 2008.[1]  T at 125.  This application was denied on March 23, 2012.  Id. at 65-68.  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on May 9, 2012 before ALJ F. Patrick Flanagan.  Id. at 75-77, 27-55.  The ALJ determined that plaintiff was not disabled.  Id. at 8-25.  Plaintiff's timely request for review was denied, making the ALJ's findings the final determination of the Commissioner.  Id. at 7.  This action followed.  Dkt. No. 1 ("Compl.").

### A. Facts[2]

### 1. Plaintiff's Hearing Testimony

Plaintiff is single, and has three children – two adult daughters who no longer live at home, and a fifteen-year-old son who resides with her.  T at 33.  Plaintiff finished the eleventh grade, but did not graduate high school or obtain a G.E.D.  Id. at 34.  Plaintiff knows how to drive, but her license is suspended.  Id. at 33-34.  She will take public transportation "but most of the time [she has] to walk."  Id. Plaintiff walked to the hearing, which she estimated to be fifteen to seventeen blocks from her home, and took

---

[1]  At the hearing, plaintiff moved to amend the alleged onset date to the date the application for benefits was filed, January 16, 2012.  T at 31.  This was confirmed by letter from plaintiff's counsel to the ALJ.  Id. at 193.

[2]  The following are not findings of fact of this Court, but are an iteration statements made by plaintiff in order to provide a background for this case.

her approximately thirty minutes.  Id. at 34.[3]  Plaintiff had to stop for breaks.  Id.  Plaintiff

testified that whenever she walks, she has to stop or take breaks.  Id.  Plaintiff last

worked as a customer service representative at a call center where she would assist

callers with questions about their cellular phones and phone plans.  Id. at 35.  Plaintiff

was able to sit or stand when she was on these calls.  Id. at 36.  Plaintiff stopped

working at this job because "[t]hat job actually closed down."  Id.  Plaintiff was also

employed at a company where she completed medical billing.  Id. at 36-37.  This was

"mostly a sit down job" but sometimes would require pulling records and filing.  Id. at 37.

Plaintiff explained that "it was mostly the whole eight hours we were actually sitting."  Id.

Plaintiff sometimes had to lift boxes, but "[i]t wasn't too – too many boxes that we would

have to actually lift."  Id. at 38.  The boxes plaintiff lifted were approximately twenty five

pounds.  Id.

Discussing her fibromyalgia, plaintiff explained that it "affects [her] whole body,"

including her arms, neck, upper and lower back, legs, and feet.  T at 39.  Plaintiff also

has carpal tunnel syndrome, which makes her hands "numb up."  Id.  Her left hand

"numbs up more than the right hand."  Id.  Plaintiff has Grave's Disease for which she

takes medication.  Id. at 40.  Plaintiff testified that her various medications "takes effect

on [her] and [she] can't really function when [she] take[s] medicine and go out on the

street."  Id.  She explained that she will be unable to walk straight and can "feel [her]self

_____

[3] After the hearing, plaintiff submitted an affidavit saying that a few days after the hearing, she walked the route between her home and the hearing location, to "verify the distance and time[.]"  T at 186. She indicates that the distance is actually eleven and a half blocks, and the walk took her thirty-seven minutes, with two breaks.  Id.

being all over the street when [she's] walking." Id.  She explained that she will not take her medicine when she is out in public and will wait to take it until she is at home.  Id. at 40.  She takes her medication every day.  Id. at 53-54.

Plaintiff testifies that she has neck pain that "bothers [her] across the shoulder." T at 41.  She visits a chiropractor for this pain.  Id.  Plaintiff also gets migraines.  Id. at 42.  She takes Verapamil and Bisoprolol for migraines.  Id.  Plaintiff testified that, initially, she did not want to take medication for her fibromyalgia because there were only three medications offered, and all of those medications also treated depression. Id. at 43.  Because plaintiff is not depressed, she did not want to take this medication. Id. at 43-44.  Plaintiff eventually agreed to take Lyrica, but it did not help her with her pain, even after her dosage was increased.  Id. at 44.  Plaintiff takes Amitriptyline to help her sleep "because in [her] sleep [her] legs numb up," and sometimes "feel like a Charlie horse . . . but it's mostly numbness and it goes down to [her] feet."  Id. at 44.

Plaintiff testified that she can walk "a few blocks" before needing to rest, and that she "pushes [her]self especially if [she] ha[s] to be somewhere at a certain time."  T at 45.  Plaintiff can carry a plastic shopping bag, but with light groceries, otherwise her "arms feel like they got weights on them – they ache."  Id.  Plaintiff's fingers will sometimes go numb and she "may drop stuff."  Id.  Plaintiff's son helps her a lot with chores and will carry in the heavy groceries.  Id. at 46, 49.  Plaintiff's only exercise is walking.  Id.  She goes to church every Wednesday and Sunday.  Id. at 47.  She helps her pastor with programs and sits with the pastor's children during service.  Id. at 48.

Plaintiff can stand still for one half of an hour before she needs to sit or lay down

4

due to pain.  T at 49.  She frequently has to shift positions when sitting or laying down. Id. at 50.  Plaintiff takes Methimazole for vertigo.  Id. at 52.  Plaintiff's vertigo will sometimes "last a couple of hours, it could last for days, it could last for weeks."  Id. Plaintiff testified that she does not believe she could return to her customer service work because she would not be able to work without her pain medication, but her medication makes her drowsy and would cause her to "doze off."  Id. at 53.

## 2.  Activities of Daily Living

In a Function Report - Adult, plaintiff reported that, "on days when [she] feel[s] better [she] can get up, get son off to school, and slowly get housework, cooking done. Some days [she] can't do it."  T at 175.  Plaintiff provided that she takes care of her teenaged son.  Id.  Because of her ailments, plaintiff cannot work or "go to places [she] used to."  Id.  She "can still do things but everything takes [her] so much longer that [she] do[es]n't bother unless [she] h[as] to go to an appointment, etc."  Id.  Plaintiff can still perform personal care, "but it takes [her] much longer and [she is] in more pain[.] [O]n bad days when she do[es]n't feel well [she] can barely get out of bed."  Id.  She reported that she sometimes needs help for personal needs or grooming because her "arms & neck & back hurt all the time so sometimes [she] need[s] help."  Id. at 176. Plaintiff indicated that she prepares food daily, but she will "sometimes . . . try to make food in 'batches' so [her] son will have leftovers."  Id.  Further, she "ha[s] to buy more prepared foods so that on days when [she's] sick & can't cook meals [she know[s] that [her] son at least can eat something."  Id.  Plaintiff's son helps prepare meals and

5

"sometimes [plaintiff] has such a bad headache [she] can't eat and [her] son has to take care of himself." Id. at 176-77. Plaintiff reported that she does cleaning, laundry, and cooking, but needs help doing these things. Id. at 177. "Sometimes [she] do[es]n't do laundry for a month because it's too painful." Id. Plaintiff will sometimes cancel appointments or will not go to church if she does not feel well. Id. Plaintiff indicated that she shops for groceries and household needs, but that it "takes twice as long as it used to. Someone has to help [her]. [She] can't carry bags, [she] get[s] dizzy, painful to walk, carry bags. [She] go[es] once a week, sometimes [she] can't go." Id. at 178. Plaintiff further provided that she "used to do more church activities & go out with friends, now [she] can't." Id. She will "still try to go to church & do things when [she] ha[s] a good day." Id. Plaintiff's pain in her legs and back, her numbness in her hands, and her migraines affect her sleep. Id. at 175.

Due to her ailments, "[e]verything takes longer, is more painful, [she] forget[s] much more." T at 179. Plaintiff spends time with others by talking on the phone with them. Id. She does not socialize "as much as [she] used to." Id. She used to go to church, but "can't always go. Don't do many other activities any more." Id. She "[c]an't go places because of pain, headaches, flushed, etc." Id. She has no problems getting along with others. Id. Plaintiff reported that her lifting is "greatly impacted – need[s] help with groceries, laundry, etc." Id. She "can't stand long – ha[s] to sit after a few minutes." Id. She travels by public transportation or walking, but reports that her walking is "greatly limited. [She] ha[s] to call [her] son to come help [her]." Id. at 177, 180. She cannot "sit long either, have to get up & move or get stiff/pain." Id. Climbing

stairs takes "twice as long – have to stop & rest." Id. at 180. If plaintiff kneels, she

"can't get up unless [she] ha[s] something to hold on to." Id. Squatting is painful for

her. Id. Reaching is "limited/painful." Id. As for using her hands, she "do[es]n't have

strength/grip/pain." Id. Her vision is blurred and she sees spots. Id. Plaintiff reported

that she can walk one or two blocks before she must rest. Id. at 181. She must "go

slowly" and she "get[s] unsteady." Id. When she stops to rest, she must rest five

minutes before she can continue walking. Id. Plaintiff reported that her "concentration

is worse. [She] used to be 'on top of [her] game.'" Id. Further, plaintiff indicated it is

hard for her to "keep on task." Id. She can follow spoken and written instructions and

does not have problems getting along with individuals in positions of authority. Id.

In addition, plaintiff indicated that stress or changes in schedule cause her to

become frustrated and depressed "that [she] can't do things." T at 182. Plaintiff also

reported that she has trouble remembering things and that this is "very noticeable," and

that she forgets things, such as appointments, "all the time." Id. Plaintiff reported that

she has headaches on a daily basis that wake her up at night. Id. Her headaches "last

for hours, sometimes throbbing wakes [her] up, meds don't help." Id. Before her

headache starts, "lights & noise irritate, [she] feel[s] horrible [her]self & feel even worse

that [she] can't be the best mother for [her] son. [She has] to go to bed, etc." Id. The

headache pain is "throbbing," is at the top of her head and in her sinuses, and the pain

is a ten out of ten. Id. at 183. Her headaches cause vision problems and sensitivity to

light and sound. Id. She takes Verapamil and Bisoprolol for migraines, but the

medication does not work. Id. Her headaches severely limit her ability to perform

personal and household activities, she "can't function - go to bed.  [She] fear[s] [she]'ll have a stroke."  Id.

## B.  Medical Opinions

### 1.  Darlene Denzien, D.O.

Dr. Denzien, plaintiff's primary care provider, completed a questionnaire on April 12, 2013.  T at 320.  She indicated that the questionnaire represents treatment she provided to plaintiff between August 26, 2011 and April 12, 2013.  Id. at 321.  Dr. Denzien provided that plaintiff had the following diagnoses: chronic fibromyalgia syndrome, chronic back pain, migraine, and Grave's Disease.  Id. at 320.  She reported that plaintiff "requires complete freedom to rest frequently without restriction."  Id. Plaintiff's pain has a severe affect – more than a thirty-three percent disruption – in her concentration and ability to sustain work pace.  Id. at 320.  Plaintiff was reported taking Lyrica and Savella.  Id. at 321.  The medication side effects were "some GI upset" and "some fatigue."  Id.  Dr. Denzien opined that plaintiff could sit for one hour in an eight-hour work day, should alternate between sitting/standing every twenty minutes, and could walk up to one hour in an eight-hour work day.  Id.  She further opined that plaintiff could lift up to ten pounds up to three hours per day, but should never lift over ten pounds.  Id.

On August 13, 2011, Dr. Denzien completed a medical assessment for the Department of Social Services' Welfare to Work Unit.  T at 294.  Her medical diagnoses were chronic fibromyalgia syndrome, low back pain, and Grave's Disease.

8

Id. Dr. Denzien indicated that plaintiff could perform no work activity, and would be able to pursue work-related activity in six months. Id. She indicated that she "just started treatment for the fibromyalgia. It will take time to adjust med & get her functioning." Id. On December 30, 2011, Dr. Denzien completed another medical assessment for the Department of Social Services' Welfare to Work Unit. T at 293. Her medical diagnoses were chronic fibromyalgia syndrome, low back pain, and Grave's Disease. Id. Dr. Denzien indicated that plaintiff could perform no work activity, and would be able to pursue work-related activity in six months. Id. She indicated that she was "[s]till trying meds – unlikely to succeed. Pt advised to apply SSI/SSDI [illegible]." Id.

### 2. Rehan Khan, M.D. - Consultative Examiner

Consultative Examiner Rehan Khan, M.D. performed a consultative internal medicine examination of plaintiff on March 6, 2012. T at 275. Plaintiff provided that she has a history of fibromyalgia, for which she has taken various medicines, without relief. Id. Oxycodone made her feel tired and fatigued. Id. Plaintiff has pain and numbness in her feet causing her "to have pain when she is walking at times." Id. Plaintiff will walk slower than usual due to pain and due to fatigue secondary to pain. Id. Plaintiff reported that her pain wakes her up at night. Id. Plaintiff also discussed osteoarthritis with bilateral knee pain and swelling. Id. Plaintiff indicated that, after she sits for a while, her knees hurt. Id. Plaintiff "sometimes has to stretch because the pain becomes unbearable." Id. at 276. Plaintiff characterized her pain as "constant," and indicated that it worsens with walking or sitting for a long period of time. Id. at 275-76.

She reported that medication does not help the pain.  Id. at 275.  Plaintiff does not like taking pain medication.  Id.  Plaintiff also complained of back pain, which is "sharp now and then."  Id.  Her lower back pain feels like "there is a weight on her lower back" and goes "all across the lower back as well as involving the hips."  Id.  Bending and walking worsens the pain.  Id.  Physical therapy did not provide "much relief."  Id.  Weather worsens the pain.  Id.

Plaintiff also complained of sciatica in her right leg. T at 276.  The pain is "sharp with a little numbness" and is a ten on a pain scale of one to ten.  Id.  Nothing helps to reduce the pain.  Id. at 277.  Plaintiff also described experiencing migraines.  Id. She takes Verapamil and Bisoprolol for migraines.  Id.  She gets migraines daily, which last throughout the day.  Id.  Noise, and sometimes sleep, makes her migraines worse.  Id. Plaintiff described her migraines as "a throbbing and the front of her face tingles and she has an achy sensation above her eyes."  Id.  Plaintiff also gets vision blurriness that she feels is related to her migraines.  Id.  Plaintiff "sees visual spots."  Id.

Plaintiff reported being able to complete most of her activities of daily living on a daily basis.  T at 277.  Plaintiff can dress herself, shower, and do childcare daily.  Id. at 277-78.  She cooks daily, but "if she is having issues cooking her son cooks something simple for her."  Id. at 278.  Plaintiff cleans "every other day depending on how well she is feeling."  Id.  She does laundry and shopping once a month.  Id.  She watches television, listens to the radio, and socializes with friends.  Id.

Dr. Khan observed that plaintiff appeared to be in "some discomfort," was "sitting uncomfortably and . . . shifting throughout the examination."  T at 278.  Plaintiff's gait

was normal, and she could walk on her heels, but complained of pain when attempting to walk on her toes.  Id.  Plaintiff could squat 1/3 before experiencing pain.  Id.  Plaintiff's stance was normal.  Id.  She did not need assistance getting on or off the exam table and could rise from her chair without difficulty.  Id.

Dr. Khan performed a fibromyalgia exam.  T at 279.  Plaintiff had twelve trigger points out of eighteen.  Id.  She had tenderness at the supraspinatus bilaterally at the origins above the scapula spine near the medial border, bilateral tenderness in the gluteal in upper outer quadrant of the buttocks in the anterior fold of the muscle, tenderness in the greater trochanter bilaterally posterior to the trochanteric prominence, tenderness at the lateral epicondyle bilateral 2cm distal to the epicondyles, and tenderness in bilateral knee at the medial fat pad proximal to the joint line.  Id.  She had full cervical spine motion, full flexion, lateral flexion, and rotary movements bilaterally.  Id.  She had full flexion of the lumbar spine, but "does complain of pain with lateral flexion to the left which limited her to 20 degrees.  The right was at 30 degrees."  Id.  Plaintiff had "positive SLR test bilaterally at 70 degrees supine."  Id.  She had full range of motion of shoulders, elbows, forearms, wrists, hips, knees, and ankles.  Id.  Plaintiff's joints "were stable, but she had diffuse tenderness."  Id.  Plaintiff "had DTRs that were physiologic and equal in upper and lower extremities."  Id. at 280.  She had strength that was five out of five in the upper and lower extremities.  Id.  She had numbness "on the left hand on the dorsal aspect.  She was unable to differentiate between sharp and dull sensation."  Id.  Plaintiff's hand and finger dexterity were intact with full grip strength, bilaterally.  Id.

11

Dr. Khan's prognosis for plaintiff was "stable." T at 280. His Medical Source Statement ("MSS") opined that plaintiff has "moderate limitations with prolonged walking, standing, sitting, climbing stairs, lifting and carrying heavy objects." Id.

### 3. M. McNaughton - State Agency Consultant

M. McNaughton, a nonexamining consultant, completed a Physical Residual Functional Capacity ("RFC") assessment on March 22, 2012. T at 56-61. McNaughton provided that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand/walk for about six hours in an eight-hour work day. Id. at 57. Plaintiff could sit for about six hours in an eight-hour work day, with normal breaks. Id. She is unlimited in her ability to push or pull. Id. Plaintiff has no postural limitations. Id. at 58. She has no environmental limitations. Id. at 59. M. McNaughton concluded that plaintiff's difficulty with exertional activities is credible, but that her statements regarding the severity of her pain "are not supported by the totality of the objective findings . . . ." Id. at 60.

## II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct

legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987);  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).   Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  However, if the correct legal standards were applied and the ALJ's finding is supported by supported by substantial evidence, such finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted); Venio v. Barnhart, 213 F.3d 578, 586 (2d Cir. 2002).

## B.  Determination of Disability[4]

"Every individual who is under a disability shall be entitled to a disability . . .

---

[4]  Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec 'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

benefit . . . ."  42 U.S.C. § 423(a)(1).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner]

14

> will consider him [or her] disabled without considering
> vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who
> is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to
> perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past
> work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  DeChirico v. Callahan,134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 U.S.C. § 405(g), as amended; Halloran, 362 F.3d at 31.  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's

position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). The Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

## C. ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ determined that plaintiff met the insured status requirements of the Social Security Act through January 16, 2012, and has not engaged in substantial gainful activity since that date. T at 11, 13. The ALJ determined that plaintiff has the following severe impairments: "a combination of mild osteoarthritis; mild degenerative disc disease (DDD) of the cervical spine; and fibromyalgia (20 C.F.R. § 416.920(c))." Id. at 13. The ALJ acknowledged that plaintiff has other impairments – migraines, carpal tunnel syndrome, and Grave's Disease – but concluded that these impairments were nonsevere. Id. As to the migraines, he noted that plaintiff "takes medicines for migraines, and although they still occur, there is no showing that they are debilitating or that they prevent her from her daily activities and/or routine functioning." Id. Her Grave's Disease is "treated with medications and results in no complaints – the claimant admits it is in good control." Id. Plaintiff's carpal tunnel syndrome has caused some complaints of hand numbness, but "has never required surgery; furthermore, there is no evidence of weakness, and

Phalen's and Tinel's clinical signs have been consistently negative[.]"  Id.

At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  T at 19.  Before reaching step four, the ALJ concluded that plaintiff has the RFC "to perform the full range of light work as defined in 20 C.F.R. 416.967(b)." Id.  The ALJ determined that plaintiff is capable of performing her past relevant work as a customer service representative, "a position that allowed her to sit or stand at her option and involved no lifting."  Id. at 21.  Thus, the ALJ concluded that plaintiff has not been under a disability, as defined under the SSA, since January 16, 2012, the date she filed her application.  Id.

## D.  Analysis

Plaintiff contends that the ALJ erred (1) in failing to find her headaches to be severe; (2) insofar as he failed to properly apply the treating physician rule, and reaching an RFC that is not based upon an acceptable medical opinion; and (3) in his credibility determination.  See generally Dkt. No. 11.

## 1.  Severity

At step two of the sequential evaluation, the ALJ must determine whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. § 416.920(a)(4)(ii).  The claimant bears the burden of presenting evidence to establish severity.  20 C.F.R. § 404.1512(c).  The claimant must demonstrate that the

impairment has "caused functional limitations that precluded him from engaging in any substantial activity for one year or more." Perez v. Astrue, 907 F. Supp. 2d 266, 272 (N.D.N.Y. 2012). A finding of not severe is appropriate when an impairment, or combination of impairments, "does not significantly limit [the claimant's] physical or mental ability to do basic work activities." Id. § 416.921(a). The regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include: (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404. 1521(b).

"The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe." Bergeron v. Astrue, No. 09-CV-1219, 2011 WL 6255372, at *3 (N.D.N.Y. Dec. 14, 2011) (quoting McConnell v. Astrue, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)). However, a condition may be found to be severe if it imposes more than minimal impairments to one's ability to work. The Second Circuit has held that the step two analysis "may do no more than screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a de minimis level, then the remaining analysis of the claim at steps three through five must be undertaken. Id. at 1030. Even if the ALJ makes a finding of

"not severe" with respect to a particular impairment, he or she must nonetheless evaluate the "combined impact [of a claimant's impairments] on a claimant's ability to work, regardless of whether every impairment is severe." Melilo v. Astrue, 06-CV-0698 (LEK/DEP), 2009 WL 1559825, at *15 (N.D.N.Y. June 3, 2009) (quoting Dixon, 54 F.3d at 1031, and citing Foster v. Bowen, 853 F.2d 483, 490 (6th Cir.1988) ("The Social Security Act requires the Secretary to consider the combined effects of impairments that individually may be nonsevere, but which in combination may constitute a medically severe impairment or otherwise evince a claimant's disability.")). Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error at step two may be harmless because the ALJ continued with sequential analysis and did not deny the claim based on the lack of a severe impairment alone. Tryon v. Astrue, 10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citation omitted).

Here, the Commissioner argues that many of the records plaintiff cites to support her claim regarding the severity of her migraines predate her alleged amended onset date, January 16, 2012, and that much of her treatment records demonstrate that she primarily sought treatment for other conditions. Dkt. No. 16 at 7-8. The Commissioner further argues that the medical records fail to show any functional impairment resulting from the migraines. Id.

Plaintiff first cites a January 10, 2010 emergency room report from Lourdes Hospital. T at 264. She appeared for migraine headaches, reported that she had a headache for a week, and indicated that she had no relief with Bisoprolol, which she took prophylatically for her migraines. Id. at 264, 267. Plaintiff was nauseous, but

denied lightheadedness, and had no "vertiginous complaints." Id. at 264. Plaintiff was treated with Compazine, Benadryl, and IV fluids. Id. at 265. "Upon reassessment, [plaintiff's] headache was down to 2/10, she states she feels better, she is no longer dizzy and she states she would like to go home." Id. A CT scan of her head was negative, and her blood work was normal. Id. at 265, 271. Plaintiff next points out that, on March 15, 2010, she visited the emergency room with a "chief complaint of perioral numbness. Had dental work on March 9th." Id. at 253. During this visit, plaintiff also "complained of feeling lightheaded and had a headache today . . . . Denies any nausea or vomiting associated with a headache." Id. at 254. She was given Tylenol for her headache. Id. After taking Tylenol, plaintiff "states that she is feeling better now. Headache is gone." Id. Plaintiff next cites to a September 22, 2011 visit to Dr. Denzien "for recheck on fibromyalgia." Id. at 209. During that visit, plaintiff indicated that her migraines were "not under good control . . . , although with the verapamil 120, it is better than it was without migraine medication at all." Id. Dr. Denzien increased the dosage of Verapamil to 180 mg/day. Id.

The medical records relating to plaintiff's migraines from the onset date forward are as follows. Plaintiff visited Dr. Denzien on March 20, 2012 "needing followup on chronic pain." T at 350. Plaintiff reported "having a lot of migraines despite the verapamil and at this point, we will consider increasing that as well." Id. At a January 19, 2012 visit, Dr. Denzien noted that plaintiff's "headaches are doing better." Id. at 352-53. On August 24, 2012, plaintiff reported to Dr. Denzien "post motor vehicle accident." Id. at 336. Plaintiff was a passenger in a bus accident on August 20, 2012.

Id. Plaintiff's main complaint "is headache, posterior cervical pain, pain across the top border of the shoulder were [sic] the trapezius muscle is and pain down into the mid thoracic spine." Id. at 336. Plaintiff was transferred from her primary care physician's office to the Emergency Room on March 28, 2013. Id. at 332-33. Plaintiff reported feeling dizzy, lightheaded, and having tingling lips. Id. at 333. She also had nausea, hot flashes, and a headache. Id. The patient transfer form indicates that her reason for transfer to the emergency room was vertigo. Id. at 332. These are all of the treatment records addressing migraines.

The ALJ did review certain medical records discussing plaintiff's migraines, including some records prior to her alleged onset date. The ALJ noted that, in an August 2011 visit with Dr. Denzien for low back pain, plaintiff's migraines "were only mentioned in passing 'by history.'" T at 16. The ALJ also cited to a September 2011 visit with Dr. Denzien, where the physician gave plaintiff migraine information, suggested she keep track of her pain levels and frequency, and indicated that she will "recheck on as-needed basis, when the patient also wants to consider ongoing treatment for this problem." Id. at 17. The ALJ next referenced a January 2012 visit with Dr. Denzien in which plaintiff reported that her "headaches were doing better." Id. at 18. He noted that at a March 20, 2012 visit, plaintiff complained of eye pain, which Dr. Denzien "thought to be possibly related to the migraines or maybe the past features of Grave's disease." Id. Next, the ALJ cited to plaintiff's March 2013 emergency room visit for "dizziness apparently associated with headache" and noted that plaintiff "was very soon discharged 'home, stable' and kept on her same usual medications, with a

21

diagnosis for benign positional vertigo and 'recurrent migraines.'" Id. at 19. Further, he noted plaintiff's testimony that she takes Verapamil and Bisoprolol for migraines. Id. at 15. He also referenced her contention that she gets migraines every day that last throughout the day. Id. The ALJ reiterated plaintiff's descriptions of her migraines to Dr. Khan where she described her migraines as a throbbing pain that causes the front of her face to tingle and an achy sensation above her eyes, and that she has vision blurriness that she attributes to the migraines. Id. The ALJ also acknowledged plaintiff's statements that she cooks daily, "but if she is having problems cooking her son cooks something simple for her," and that she "cleans every other day, the extent depending on how well she is feeling." Id.

The Court notes that, although the ALJ referenced two visits with Dr. Denzien that occurred prior to the alleged onset date, two post-onset date visits, and one emergency room visit, he did not address plaintiff's January 2010 emergency room visit for migraines; her March 2010 emergency room visit for dental numbness, wherein she also complained of a headache; the September 22, 2011 visit to Dr. Denzien wherein plaintiff reported her migraines to be under poor control, but better with Verapamil then without; her March 20, 2012 "chronic pain follow up" with Dr. Denzien where plaintiff reported "having a lot of headaches despite the Verapamil"; or the August 20, 2012 post-accident visit with Dr. Denzien where one of plaintiff's complaints was headache. T at 209, 253, 264, 336, 350. Although the ALJ may not have referenced every single medical record wherein plaintiff complained of migraines, nor each specific statement she made in her activities of daily living form, he largely addressed plaintiff's medical

records relating to her migraines. Further, many of these records do not primarily involve treatment for migraines. At the March 2010 emergency room visit, plaintiff did not present for a migraine, and her migraine went away after taking Tylenol. Id. at 254. Similarly, at the March 28, 2013 emergency room visit, plaintiff presented for "dizziness president for the last 24 hours associated with headache." Id. at 296. She reported that she had a "history of migraines and headache typical of her usual migraine, the onset was gradual, continuous, achy, diffuse, throughout her head and associated symptoms today are dizziness." Id. Plaintiff was given "Phenergan, Benadryl, meclizine with complete resolution of her headache and dizziness." Id. at 297. She was diagnosed with benign positional vertigo and recurrent migraine. She was discharged "[h]ome, stable." Id.

The ALJ also acknowledged plaintiff's claim that her medications were ineffective in controlling her migraines, her statements regarding the frequency of her migraines, and some of her claims about the impact of her migraines on her activities of daily living. T at 13 ("the claimant takes medicines for migraines, and although they still occur..."), 15. The ALJ concluded that plaintiff had other severe impairments, and did not deny benefits based on a lack of severe impairment. He continued to assess plaintiff's migraines beyond the step two analysis.

Plaintiff suggests that Dr. Denzien concluded that "the migraines would limit Plaintiff's ability to get to work on a regular basis and concentrate at work on a regular basis." Dkt. No. 11 at 25. However, contrary to plaintiff's brief, there is no medical statement in the record indicating any limitations caused by her migraines. Dr.

Denzien's questionnaire indicated generally that plaintiff's pain caused a severe limitation on her ability to concentrate and sustain work pace; yet, the questionnaire did not attribute her pain to any specific condition nor indicate whether she was intending to refer to the pain caused by plaintiff's conditions collectively. Id. at 320. Further, the questionnaire makes no mention plaintiff's migraines beyond including them as one her diagnoses. Id. Dr. Denzien does not list any of plaintiff's migraine medications when asked for the medications currently taken by plaintiff. Id. at 321; see Spina v. Colvin, 11-CV-1496, 2014 WL 502503, at *4 (N.D.N.Y. Feb. 7, 2014) ("In the absence of any medical source opinion specifying limitations posed by [the] plaintiff's migraines on his ability to perform basic work activities, the ALJ's finding that [the] plaintiff's migraines are a nonsevere impairment is supported by substantial evidence.").

In sum, the undersigned concludes that the ALJ did not err in failing to find plaintiff's migraines severe, and even if an error was present, such error would be harmless, as the ALJ continued past the step two analysis, and considered plaintiff's migraines during the remaining steps in the sequential evaluation. See, e.g., Tryon, 2012 WL 398952, at *3.

## 2. Weighing of Medical Evidence

Plaintiff first argues that the ALJ erred in failing to assign controlling weight to treating physician Dr. Denzien's opinion. Dkt. No. 11 at 24. She contends that the ALJ failed to consider the necessary factors in assessing Dr. Denzien's opinion. Id. Next, she argues that the ALJ improperly discounted Dr. Denzien's fibromyalgia diagnosis

due to an apparent lack of objective findings.  Id.  Finally, plaintiff argues that the ALJ's "improper assessment of Dr. Denzien's opinion is exacerbated by ALJ's failure to accept any opinion given to him, either from Plaintiff's source or Defendant's source since the Defendant's expert is also given little weight."  Id. at 24.[5]

### 1.  Treating Physician Rule

Under the "treating physician's rule," the ALJ must give "controlling weight" to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  20 C.F.R. § 404.1527(d)(2); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).  Although the treating physician rule need not be applied if the treating physician's opinion is inconsistent with opinions or other medical records, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician."  Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).  Even when the treating physician's opinion is not given controlling weight, an ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is

---

[5] On the next page of her brief, plaintiff argues that "there is no contrary opinion [to Dr. Denzien's] since the ALJ does not give any medical source any weight."  Dkt. No. 11 at 25.  The Court notes that ALJ accorded "some weight" to Dr. Khan's opinion.  T at 21.

from a specialist; and (v) other factors . . . . " <u>Hallorhan</u>, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)).  The ALJ is also required to set forth her reasons for the weight she assigns to the treating physician's opinion.  <u>Id.</u>  The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." <u>Halloran</u>, 362 F.3d at 33; <u>Brogan-Dawley v. Astrue</u>, 484 F. App'x 632, 633 (2d Cir. 2012).  However, "where the evidence of record permits [the court] to glean the rationale of an ALJ's decision," the ALJ need not "have mentioned every item of testimony presented to him [or her] or have explained why he [or she] considered particular evidence unpersuasive or insufficient to lead him [or her] to a conclusion of disability." <u>Petrie v. Astrue</u>, 412 F. Appx. 401, 407 (2d Cir. 2011).

Here, the ALJ accorded Dr. Denzien's opinion little weight. T at 20.  The reasons provided were (1) that Dr. Denzien's opinion as to the severity of plaintiff's fibromyalgia is inconsistent with the record; (2) there are "no positive clinical findings of significant loss of motion, weakness, or atrophy; or any x-ray or other imaging studies showing significant abnormalities resulting from any of the diagnosed impairments"; (3) plaintiff's reported activities conflict with Dr. Denzien's opined limitations; and (4) Dr. Denzien reported side effects from medication, but such side effects are not documented in the medical records, and, although Dr. Denzien notes side effects from Savella, "Dr. Denzien's assessment was not made until April 12, 2012, almost two

years after the claimant stopped taking the Savella." T at 20-21.

A longitudinal assessment of plaintiff's treatment for fibromyalgia provides support for Dr. Denzien's statements of limitation. Addressing the first factor, which reviews the treatment relationship and frequency of treatment, 20 C.F.R. § 404.1527(c)(2), Dr. Denzien is plaintiff's treating physician, and she has been treating plaintiff since at least as early as March 2010. T at 253 (record noting Dr. Denzien as plaintiff's primary care physician). Thus, her opinion was entitled to controlling weight unless he found that her opinion was contradicted by substantial evidence in the record. The administrative transcript reveals that plaintiff visited Dr. Denzien on December 6, 2011, "complaining of body aches all over." Id. at 357. Dr. Denzien noted that plaintiff's "numerous trigger points consistent with known history of fibromyalgia," and plaintiff's continued refusal to take Savella, Cymbalta, or Lyrica "because she does not want to take any of the medications that impact brain interpretation of pain. She wants to take something that will just help with the pain immediately." Id. On December 26, 2011, plaintiff reported that she was sleeping a little better with the amitriptyline and Lyrica, but she was still in a lot of pain. Id. at 354. She complained of "her usual diffuse myalgias and arthalgias consistent with known history of fibromyalgia" and reported "a new complaint of pain in the right leg across the trochanter and down to the knee." Id. Dr. Denzien increased the Lyrica dosage. Id.

On January 19, 2012, plaintiff presented "needing a recheck on her chronic fibromyalgia." T at 352. Plaintiff did not experience side effects from the Lyrica, "but not seen any real improvement[,]" though Dr. Denzien noted that plaintiff's reported

27

pain was two points lower on the pain scale than at her last visit.  Id.  Dr. Denzien increased her Lyrica to 100 m.g. b.i.d.  Id.  On March 20, 2012, plaintiff reported chronic pain and indicated that she wanted an increase in her dosage of Lyrica.  Id. at 350.  Dr. Denzien increased the Lyrica to 150 m.g. b.i.d. "for a few days" to "see if that improves the fibro problems."  Id.  On April 25, 2012, plaintiff reported for a "follow[] up on chronic pain."  Id. at 342.  Dr. Denzien noted that "nothing we have used thus far has been of any real particular benefit to [plaintiff], although she feels at least marginally better on her current medications than she did before."  Id.  Plaintiff reported "a lot of pain in her feet radiating up to her knees."  Id.  On July 7, 2012, plaintiff reported being in "agonizing pain," and indicated to Dr. Denzien that "nothing we have tried this far has been helpful."  Id. at 340.  Dr. Denzien noted that plaintiff was "up to Lyrica 300 mg b.i.d.," refused Cymbalta "because it is an antidepressant," and started plaintiff on "Savella at 12.5 mg with an upward taper to 50 b.i.d."  Id.  On August 2, 2012, plaintiff reported pain in her right hip.  Id. at 338.  Dr. Denzien noted that plaintiff had problems with Savella, including nausea, but noted that she continued to take Savella, and experienced no pain relief.  Id.  Dr. Denzien noted that plaintiff "has not seen much improvement in the overall fibro pain."  Id.  Dr. Denzien further noted marked tenderness in plaintiff's right trochanteric area.  Id.  Plaintiff was given an injection of lidocaine 2% and Depo-Medrol 40 mg/mL in the right trochanter.  Id.

As for the second factor – evidence in support of the physician's opinion – the ALJ rejects Dr. Denzien's opinion in part because there were "no findings other than positive tender points with regard to the fibromyalgia."  T at 21; 20 C.F.R. §

404.1527(c)(2). Although there may be a lack of objective medical evidence beyond plaintiff's trigger points,[6] due to the nature of fibromyalgia, such findings cannot be expected. Fibromyalgia is defined by the Commissioner as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least three months." SSR 12-2p, Titles II and XVI: Evaluation of Fibromyalgia, 2012 WL 3104869, at *3 (S.S.A. July 25, 2012). This Court has repeatedly noted that fibromyalgia is a

> medical abnormality consisting of a syndrome of chronic pain of musculoskeletal origin but uncertain cause. Persons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have normal physical examinations, e.g., full range of motion, no joint swelling, normal muscle strength and normal neurological reactions. Thus, lack of positive, objective clinical findings does not rule out the presence of fibromyalgia, but may, instead, serve to confirm its diagnosis.

Mnich v. Colvin, 14-CV-740 (DNH/CFH), 2015 WL 7769236, at *17 (N.D.N.Y. Sept. 8, 2015) (quoting Campbell v. Colvin, 13-CV-451 (GLS/ESH), 2015 WL 73763, at *5 (N.D.N.Y. Jan. 6, 2015)).

Thus, it is well-settled in this Circuit and District that the

> absence of medically-acceptable clinical and laboratory diagnostic findings (beyond clinical signs and symptoms necessary for a diagnosis) is a legally improper basis for rejecting a medical source opinion. Conversely, reliance on subjective complaints in fibromyalgia cases hardly

---

[6] The undersigned was unable to find a record from Dr. Denzien that noted the exact number of plaintiff's trigger points. See, e.g., T at 357 (noting that plaintiff had "numerous trigger points."). However, consultative examiner Dr. Khan found twelve trigger points out of eighteen, T at 279, which has been considered sufficient for a diagnosis of fibromyalgia. THE MERCK MANUAL 375-76 (Keryn A.G. Lane, ed., 19th ed. 2011).

> undermines medical opinion as to functional limitations it
> produces because patients' reports of complaints and
> histories are essential diagnostic tools.

Campbell, 2015 WL 73763, at *6 (citing Green-Younger v. Barnhart, 335 F.3d 99, 107

(2d Cir. 2003)).  Indeed, "denying a fibromyalgia-claimant's claim of disability based in

part on a perceived lack of objective evidence is reversible error." Id. (citing Grenier v.

Colvin, 13-CV-484 (GLS), 2014 WL 3509832, at *3-4 (N.D.N.Y. July 14, 2014)).

However, the "mere diagnosis of fibromyalgia without a finding as to the severity of

symptoms and limitations does not mandate a finding of disability." Rivers v. Astrue,

280 F. App'x 20, 22 (2d Cir. 2008).

Plaintiff's consistent complaints of pain, which Dr. Denzien largely attributed to

fibromyalgia, are found throughout Dr. Denzien's treatment records.[7]  T at 338, 340,

342, 250, 352, 254, 357.  Plaintiff repeatedly complained of chronic pain and had her

dosage of her fibromyalgia medications increased, but still found no relief, or only

marginal improvement with the medication.  Id. at 340, 342, 350.  Thus, insofar as the

ALJ rejected Dr. Denzien's opinion because of a lack of objective findings regarding

plaintiff's fibromyalgia beyond trigger points, such was improper and warrants remand.

As to the third factor, consistency with the record, 20 C.F.R. § 404.1527(a)(2),

the ALJ discredited Dr. Denzien's opinion regarding plaintiff's limitations on walking,

standing, and sitting, finding it inconsistent with (1) Dr. Denzien's treatment records,

---

[7]  Although Dr. Denzien did not conclude that plaintiff's trouble sleeping and nausea were connected to her fibromyalgia, the undersigned notes – though does not find dispositive – that The Merck Manual provides that such conditions are often symptoms and signs of fibromyalgia.  THE MERCK MANUAL 875 (Keryn A.G. Lane, ed., 19th ed. 2011).

insofar as it indicated plaintiff's side effects from medication; and (2) plaintiff's range of activities, such as her frequent walking and her ability to take a several-hour bus trip to New York City.  T at 21.

Addressing first Dr. Denzien's review of medication side effects, in her April 2013 questionnaire, Dr. Denzien indicated that plaintiff took Savella 50 m.g. and Lyrica 300 m.g., and experienced "some GI upset" and "some fatigue" from them.  T at 321. The ALJ opines that the records do not support side effects from Lyrica, and, although Savella caused nausea, Dr. Denzien authored her questionnaire on April 12, 2012, two years afer plaintiff stopped taking Savella.  Id. at 21.  The Court takes notice that Dr. Denzien's questionnaire was dated April 12, 2013.  Id. at 321. In the questionnaire, Dr. Denzien explicitly indicated that her answers represent the time period from August 26, 2011 to April 12, 2013.  Id.  Although the questionnaire asked about the medications "currently being taken by the claimant," as Dr. Denzien provided that the questionnaire was also meant to be retrospective, it does not appear to be inaccurate for her to list medications from within that time frame.  Id.  Medical records demonstrate that plaintiff took Savella and Lyrica within that time.  Id. at 338, 340-41.  On December 7, 2012, Dr. Denzien increased plaintiff's dosage of Lyrica to 300 mg b.i.d. and started plaintiff on Savella at 12.5 m.g. with an upward taper to 50 b.i.d.  Id. at 340-41.  By August 2012, plaintiff reported nausea with Savella. Id. at 338.  Dr. Denzien indicated that she was going to "ride that out," by continuing the Savella but not increasing the dosage.  Id. Thus, plaintiff was taking Savella 50 m.g. at least until August 2012.  Id.  It appears

Savella was stopped in February 2013.  Id. at 330.[8]

Regarding Dr. Denzien's indication of medication side effects, as plaintiff did experiencing nausea from the Savella, a medication taken during that time frame, indicating such side effects would not be inappropriate.  T at 330.  Insofar as the ALJ concluded that Dr. Denzien's provision for fatigue from medications was not reflected in Dr. Denzien's treatment notes, the ALJ was required to attempt to recontact Dr. Denzien for clarification about this comment.  An ALJ is required to recontact a treating physician to clarify his or her opinion where it "contains conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).   Here, the ALJ determined that this side effect appeared unsupported by Dr. Denzien's treatment notes, and lessened the weight he accorded to her opinion due to this apparent inconsistency instead of attempting to obtain clarification.   Accordingly, on remand, reliance on this "unsupported" opinion regarding symptoms to discredit or lessen the weight accorded to Dr. Denzien's opinion must be preceded by an attempt to obtain clarification from the physician.

Next, the ALJ found that Dr. Denzien's opinions regarding plaintiff's physical limitations on sitting and standing to be contradicted by plaintiff's frequent walking and

---

[8]  In a Master Medication List from Lourdes Hospital, it is indicated that plaintiff was taking Savella at least through August 24, 2012.  T at 330.  The "key" on this chart provides that a check mark means that the patient is taking the medication, and an "X" means that the patient is not taking the medication. Id.  A check mark appears next to Savella through August 2012.  Id.  An "X" appears in February 2013 column, along with a circle over the word "stop."  Id.  Thus, the records indicate that plaintiff stopped Savella by February 2013.  Id.

32

her ability to travel by bus to New York City.  T at 21.  The ALJ may appropriately consider plaintiff's reported activities when considering whether Dr. Denzien's opined limitations are consistent with the record.  Fox v. Colvin, 589 F. App'x 35, 36 (2d Cir. 2015 (summary order) (noting that an ALJ may properly decline to accord controlling weight to a treating physician where the opinion is contradicted by substantial evidence, including the plaintiff's testimony and other medical experts) (citing Hallorhan, 362 F.3d at 32).  However, the ALJ did not address the limitations plaintiff provided regarding her ability to walk.  Plaintiff testified that, despite plaintiff being able to walk to the hearing – a distance of apparently eleven and a half blocks – she had to stop along the way.  T at 34; 186.  Further, although she walks as a means of transportation, and apparently recreation, plaintiff indicated that she can only walk one to two blocks, or "a few blocks" before she needs to stop and rest.  Id. at 45, 181.  She must rest for five minutes before she can begin walking again.  Id. at 181.  She must go slowly when she walks because she gets unsteady.  Id.  She will sometimes need to call her son to come get her.  Id. at 177, 180.  Plaintiff testified that she "pushes [her]self [to walk] especially if [she] ha[s] to be somewhere at a certain time."  Id. at 45.

This Court has previously held it to be improper where the ALJ discredited a treating physician's opinion based on a plaintiff's reported activities when the ALJ did not consider that the plaintiff also testified to limitations regarding those physical activities.  Ganoe v. Commissioner of Soc. Sec., 14-CV-1396 (GTS/WBC), 2015 WL 9267442, at *5 (N.D.N.Y. Nov. 23, 2015).  Thus, although the ALJ may consider plaintiff's reported activities and any inconsistency between those activities and the

physician's opined limitations, the ALJ should have also evaluated the plaintiff's testimony and records regarding the limitations on those activities.

Plaintiff also argues that it was improper for the ALJ to accord Dr. Denzien's claims less weight due to the fact that she took a bus to and from New York City. Dkt. No. 11 at 21. Plaintiff argues that the ALJ

> simply assumed without any evidence that Plaintiff sat throughout a bus trip without making any changes to her position. It is equally consistent that she could have had a seat where she could have had her feet up, that she could have stood if she needed to, that she could shift around and that she may have been able to tolerate sitting for some portions of the ride, but not being able to concentrate or keep up with a pace of work in a sitting situation at a job.

Id. Unlike plaintiff's testimony about walking, the undersigned finds no fault with the ALJ's reliance on the bus trip to counter Dr. Denzien's opinion that plaintiff could sit/walk for only an hour each in an eight-hour work day. Despite plaintiff's contentions in her brief that it is possible that she stood, kept her feet up, or shifted positions during this trip, Dkt. No. 11 at 21, unlike the specific limitations testified to regarding her walking, there was no testimony in the record indicating such limitations while riding on public transit. Thus, the ALJ could appropriately consider this activity.

Accordingly, on remand, an ALJ is to give appropriate consideration to Dr. Denzien's findings, with the understanding that fibromyalgia does not require objective findings; recontact Dr. Denzien regarding any inconsistencies in her questionnaire before discounting the weight to be accorded to her position because of those perceived inconsistencies; and fully consider any limitations plaintiff testified to regarding her ability to participate in activities of daily living.

34

## 2. Remaining Medical Opinion Evidence

Plaintiff further argues that, because the ALJ accorded only little weight to her treating physician's opinion as to her limitations, and "some weight" to consultative examiner Dr. Khan's statement of limitations, the ALJ's RFC is not supported by medical opinion, and, thus, is unsupported by substantial evidence. Dkt No. 11 at 24. Although the undersigned agrees that the ALJ improperly accorded little weight to Dr. Denzien's opinion, and that the matter must be remanded for that reason, this argument merits a brief review.

The ALJ noted that he gave "some weight" to Dr. Khan's conclusions, but indicated that "it is too vague to be given more significance in this decision." T at 21. As discussed, Dr. Khan's MSS provided that plaintiff has "moderate limitations with prolonged walking, standing, sitting, climbing stairs, lifting and carrying heavy objects." Id. at 280. It is well settled that "[t]here is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations[.]" Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013). Moreover, the Second Circuit has held that a medical opinion's "use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding her [or his] considerable and constant exposure to medical evidence, to make the necessary inference that [the claimant] can perform the exertional requirements of the [relevant level] of work." Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000), superceded by regulation on other grounds by 20 C.F.R. § 404.1560(c)(2) (citing Balsamo v. Chater, 142 F.4d 75, 81-82 (2d Cir. 1998)).

Here, despite according only "some weight" to Dr. Khan's examination and report, the ALJ's RFC "was consistent with [Dr. Khan's] analysis in all relevant ways." Curry, 209 F.3d at 123. Similarly, despite a complete failure to mention the state agency consultant, M. McNaughton's, report, the ALJ appears to have adopted entirely the assessment set forth therein. T at 57. M. McNaughton opined that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for at least six hours, sit for at least six hours, and had no limitations on pushing or pulling. Id. Such an assessment is reflective of an ability to perform the full range of light work.[9]

Dr. Khan's opined "moderate limitation" with "prolonged walking, standing, sitting, climbing stairs, lifting and carrying heavy objects," cannot be sufficiently supplemented by reviewing his examination of plaintiff and her physical abilities during the exam. Although Dr. Khan noted that plaintiff had normal gait and stance, could walk on her heels, rise from chair without difficulty, get on/off exam table without difficulty, had full cervical spine motion; full flexion, lateral flexion, and rotary movements bilaterally; full flexion of lumbar spine; full range of motion of shoulders, elbows, forearms, wrists, hips,

---

[9] Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567 (b).

knees, and ankles; full strength in upper and lower extremities; full grip strength; and intact hand/finger dexterity, T at 278, such findings, without an accompanying assessment of plaintiff's specific abilities or limitations, do not suffice to lead the ALJ to the conclusion that plaintiff could perform light work.  This is particularly true due to plaintiff's fibromyalgia diagnosis, as fibromyalgia often does not have such objective findings.  Mnich, 2015 WL 7769236, at *18 (noting that regular grip strength and range of rotation is "not necessarily determinative" where a plaintiff has a fibromyalgia diagnosis); cf. Caci v. Colvin, 14-CV-1407 (LEK/TWD), 2015 WL 9997202 (N.D.N.Y. Dec. 22, 2015), adopted by 2016 WL 427098 (N.D.N.Y. Feb. 3, 2016) (finding that, although consultative examiner's assessment merely provided that the plaintiff had "moderate limitations" in standing, walking, and climbing, his finding was supported by a "thorough examination" wherein the doctor noted that the plaintiff could not walk on heels, toes, or crouch; needed crutches; had tenderness in her knee; full range of motion in upper extremities; full grip strength; full flexion, extension, and rotary movement of her spine; and full range of motion in her right knee and hip).

Here, the ALJ accorded Dr. Khan's opinion "some weight" because he considered the opinion to be "vague."  T at 21.  As noted above, it is unclear how "moderate limitations" in "prolonged walking, sitting, climbing stairs, lifting and carrying heaving objects" translates to an ability to do the full range of light work.  Id.  As noted, light work requires standing and/or walking for six hours in an eight-hour work day and sitting for at least two hours, or "'sitting most of the time with some pushing and pulling of arm and leg controls.'"  Hayes v. Colvin, 13-CV-1566 (MAD/TWB), 2015 WL

1033058, at *9 (N.D.N.Y. Mar. 9, 2015) (citing S.S.R. 83-10 and quoting 20 C.F.R. § 404.1567(b)).  Although the ALJ opined that plaintiff could perform light work, and thus, that plaintiff can walk/stand for at least six hours, sit for at least two, or do mostly sitting for the entirety of an eight-hour work day, it is unclear on what medical evidence he based this finding.  The undersigned is unable to determine, from Dr. Khan's admittedly "vague" RFC, that plaintiff is capable of these specific functions.  Thus, on remand, the ALJ is to obtain an RFC from an appropriate medical source that specifically sets forth the physical limitations plaintiff has, if any, to perform basic work activities.

### 3. **Credibility**

Plaintiff argues that the ALJ erred in his credibility determination, specifically insofar as he "fail[ed] to appreciate both the fibromyalgia and the migraines produced significant periods of time that the Plaintiff would not be able to adequately function at work even though there would be times that she would."  Dkt. No. 11 at 15.  Where objective evidence does not substantiate the intensity, persistence, or limiting effects of the claimant's alleged symptoms, the ALJ must assess the subjective complaints by considering the record in light of the following factors: (1) the claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication taken by the claimant to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any

other factors.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186 (1996).

Moreover, a plaintiff's statements regarding her ability to care for herself "'do not by

themselves contradict allegations of disability,' as people should not be penalized for

enduring the pain of their disability in order to care for themselves." Manning v. Astrue,

No. 09-CV-88 (FJS/VEB), 2010 WL 2243350, at *6 (N.D.N.Y. Apr. 30, 2010) (quoting

Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000)).

Having found remand necessary due to errors in the ALJ's RFC assessment, the

Court need not reach plaintiff's arguments that the ALJ erroneously assessed her

credibility.  The credibility arguments will be "necessarily be altered" upon the ALJ's

development of the record as directed by this Memorandum-Decision and Order.

Crowley v. Colvin, 13-CV-1723 (AJN/RLE), 2014 WL 4631888, *5 (S.D.N.Y. Sept. 15,

2014).

However, with a goal to avoid any possible repeat on remand, the Court finds it

necessary to address one of plaintiff's points.  Dkt. No. 11 at 16-18.  The ALJ, in

discussing plaintiff's credibility, refers to the fact that plaintiff "has refused to take

several of the recommended medications for her fibromyalgia (Cymbalta, for instance)."

T at 20.  The ALJ's discussion of plaintiff's refusal to take certain fibromyalgia

medications is not an entirely accurate representation of the evidence in the record.  It

is accurate that plaintiff resisted taking Savella, Cymbalta, or Lyrica – the only approved

medications for fibromyalgia – as she did not want to be on a medication that also

treated depression out of a fear that it would "impact brain interpretation of pain."  T at

357.  She instead requested painkillers in order to provide immediate pain relief.  Id.  At

that same appointment, on December 7, 2011, Dr. Denzien indicated that she would start plaintiff on amitriptyline 10 mg at bedtime to improve sleep and Lyrica 25 mg b.i.d. Id. The treatment note indicates that plaintiff "expresses some understanding although she really does not like it much[.]" Id. On August 18, 2011, Dr. Denzien started plaintiff on Cymbalta. Id. at 210. Dr. Denzien noted that she advised plaintiff on Cymbalta, which she recommended before a couple of times," and informed her of "the fact that it now has actually been FDA approved for use for chronic pain," which made "a bit of an impression" on plaintiff "because she never wanted to use a depression pill for this purpose before[.]" Id. at 210. Plaintiff agreed to try the Cymbalta. Id. On September 22, 2011, Dr. Denzien reported that plaintiff took Cymbalta "for a couple of days . . . had side effects, decided she did not want to be on medication for depression and stopped taking it." Id. at 209. Dr. Denzien's treatment note indicated that the side effect, nausea, was mild. Id. Despite plaintiff's misgivings with depression medication being used to treat fibromyalgia, beginning in December 2011, she started taking Savella, continuing for some time, despite experiencing nausea, and then began taking Lyrica. T at 338, 340, 357.

SSR 96-7p provides that a claimant's statements

> may be less credible if the level or frequency of treatment is
> inconsistent with the level of complaints, or if the medical
> reports or records show that the individual is not following
> the treatment as prescribed and there are no good reasons
> for this failure. However, the adjudicator must not draw any
> inferences about an individual's symptoms and their
> functional effects from a failure to seek or pursue regular
> medical treatment without first considering any explanations
> that the individual may provide, or other information in the
> case record, that may explain infrequent or irregular medical

40

visits or failure to seek medical treatment.

SSR 96-7p, 1996 WL 374186, at *7 (1996). SSR 96-7p advises ALJs to consider "good reasons" a claimant may have for failing to follow a treatment plan. Id. These reasons include an inability to afford treatment, religious beliefs, or where side effects are less tolerable than the symptoms. Id.; 20 C.F.R. § 404.1520(b). "Credibility determinations, including a claimant's characterizations about symptoms and compliance with medication, are indisputably the purview of the ALJ." Fratello v. Colvin, 13-CV-4339 (VSB/JLC), 2014 WL 4207590, *14 (S.D.N.Y. Aug. 20, 2014), report and recommendation adopted sub nom. by 2015 WL 5091949 (S.D.N.Y. Oct. 9, 2014).

Although the ALJ may rely on plaintiff's refusal to take fibromyalgia medications that also treat depression, and the fact that plaintiff stopped taking Cymbalta after only a couple of days due to mild nausea, in assessing her credibility, it is not appropriate for the ALJ to rely on this refusal without also addressing the fact that plaintiff eventually began taking Savella and Lyrica, and was compliant with that medication, despite no relief, or limited relief. The ALJ did not review any of plaintiff's provided reasons for her initial decision to decline to take Cymbalta, Savella, and Lyrica, or her reason for stopping the Cymbalta. Cf. Bockeno v. Commissioner of Soc. Sec., 15-CV-365 (GTS), 2015 WL 5512348, at *7 (N.D.N.Y. Sept. 15, 2015) (finding that the ALJ properly considered the plaintiff's noncompliance with her medication in making a credibility determination, but noting that the ALJ also considered the plaintiff's alleged reasons for being noncompliant). Although the ALJ may find that these are not "good reasons," he must still review such reasons in making his credibility assessment.

On remand, the ALJ is advised that any refusal to take medication may be considered in reaching a credibility determination, but such evidence should also be considered and balanced against the entirety of plaintiff's medication compliance, and contain an assessment of whether any noncompliance is accompanied with any "good reasons." See 20 C.F.R. § 404.1520(b).

## III.  Conclusion

Having reviewed the administrative transcript and the ALJ's findings, the Court concludes that the ALJ's determination is not supported by substantial evidence. Remand for further administrative action consistent with this Memorandum-Decision and Order is needed.  Accordingly, it is hereby

**ORDERED** that plaintiff's motion for judgment on the pleadings is

**GRANTED** (Dkt. No. 11).  The matter is remanded to the Commissioner for additional proceedings pursuant to sentence four of 42 U.S.C. 405(g); and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 16) is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court serve copies of the Memorandum Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated: March 30, 2016
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

42